CITY GAS COMPANY OF FLORIDA, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent City Gas Co. v. Commissioner
Docket Nos. 8808-73, 8807-73, 8809-73.
United States Tax Court
T.C. Memo 1984-44; 1984 Tax Ct. Memo LEXIS 629; 47 T.C.M. (CCH) 971; T.C.M. (RIA) 84044; January 26, 1984. *629 Petitioners are gas utility companies. Before service was commenced, petitioners required each customer to make a cash deposit to secure payment of all bills rendered to the customer. When service was terminated the deposit was typically credited against charges for gas consumed and other items in the customer's final bill. Held: The deposits are better characterized as prepayments of income items than as security for non-income-producing covenants. Therefore, the deposits constituted income to petitioners. Held: The deposits constituted substantial advance payments for inventoriable goods and, as such, were includable in income no later than the last day of the second taxable year following the year of receipt. Sec. 1.451-5(c)(1), Income Tax Regs.
Held: The Change in the method of accounting for the deposits resulting from the foregoing holdings constituted a change in petitioners' "method of accounting" for purposes of sec. 481, I.R.C. 1954. David W. Richmond and Charles J. Monahan for the petitioners. David M. Berman for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: These cases are before this Court on remand from the Court of Appeals *630 for the Eleventh Circuit. The issues for decision are: 1. Whether the petitioner-utility companies realized income as a result of receiving security deposits from their customers; 2. If so, in what year the income must be recognized; and 3. Whether the treatment of the deposits urged by respondent constitutes a change in petitioners' method of accounting for purposes of section 481. [2]
FINDINGS OF FACT Subsequent to the receipt of the mandate of remand pursuant to City Gas Co. of Florida v. Commissioner,689 F.2d 943 (11th Cir. 1982), revg. and remanding 74 T.C. 386 (1980), a further trial was held at which testimony was heard and additional exhibits were received in evidence. Rather than make supplemental findings, we have recast and here set forth all findings essential to the disposition of the case under the legal standards enunciated by the court of appeals. Petitioners City Gas Co. of Florida (City Gas), Dade Gas Co. (Dade Gas), and Dri-Gas Corp. (Dri-Gas) are Florida corporations. Dade Gas and Dri-Gas are wholly owned subsidiaries of City *631 Gas. During the years in issue, fiscal years 1963-1964 and 1966-1968, all of the petitioners reported their taxable income according to the accrual method of accounting. City Gas was a regulated public utility, under the jurisdiction of the Florida Public Service Commission (FPSC) during the years in issue.It was engaged in the business of selling natural gas to both residential and commercial customers. Dade Gas and Dri-Gas, engaged in the business of selling liquid propane gas, were nonregulated. During the years in issue, the FPSC permitted the utilities under its jurisdiction to require their customers to make "a cash deposit intended to guarantee payment of bills, such deposit not to exceed ten dollars ($10.00) or an amount necessary to cover charges for service for two billing periods, whichever is greater." The FPSC required utilities under its jurisdiction to pay interest at a rate of at least 4 percent on customer deposits. Each petitioner required deposits of their customers. City Gas paid interest on the deposits, as required by the FPSC. Because they were not subject to the jurisdiction of the FPSC, Dade Gas and Dri-Gas did not pay interest on customer deposits. Petitioners *632 issued their customers a receipt for each deposit which stated: To be held as a deposit to secure payment of all bills for service rendered above customer. Upon discontinuance of service, or at the election of the company prior thereto, the amount of this deposit will be returned to the depositor after deducting any amounts owed to the company. Petitioners treated the customer deposits as current liabilities for both tax reporting and financial reporting purposes. [3] Accordingly, they reported no income on receipt of the deposits. Customers were billed based on the amount of gas consumed, without regard to the security deposits. When a customer discontinued service, the security deposit was typically credited against the amount of his final bill. If the deposit exceeded the charges on the final bill, the customer was issued a check in the amount of the excess. In October 1978, the first month for which records are *633 still available, 1,015 final bills were issued. Refund checks covering all or part of their deposits were issued to 591 customers. The bills of the remaining 424 customers showed a balance due, because the charges exceeded the amount of the security deposit. The proportion of bills showing refunds to those showing a balance due was probably about the same during the years in issue. Dade Gas and Dri-Gas had storage tanks for gas purchased from their suppliers but not yet delivered to their customers. City Gas, by contrast, had no such storage facility. Its gas flowed continuously from the pipeline of its supplier into its own distribution lines. Each month City Gas accrued as income the retail price of all gas purchased during the month, even though some of the gas had not yet been billed to customers. Because all of the gas acquired by City Gas was immediately reported as sold, it maintained no inventory account. A portion of the customer deposits listed on the books of account of City Gas in fiscal 1966 were not received directly by City Gas in cash, but were liabilities incurred during the early 1960's by the other gas companies and acquired and assumed by City Gas through the *634 acquisition of these companies. Dade Gas and Dri-Gas also received deposits during the fiscal years 1961 and 1962, and 1961, 1962, and 1963, respectively, by acquisition. These customer deposits were treated in all material respects the same as the deposits received directly by petitioners. In notices of deficiency dated September 14, 1973, respondent determined that customer deposits received by petitioners were advance payments for gas. Accordingly, he included in the income of petitioners the following amounts: 1966
1967
1968
City Gas
[1] $598,033.94
$72,500.52
$71,887.46
Date Gas
[2] 158,604.84
1,604.43
0
Dri-Gas
[2] 42,180.76
4,543.96
3,445.41
OPINION 1. Tax Character of the Deposits
The court of appeals stated, as follows, the standard of law to be applied in determining whether the customer deposits constituted taxable income (689 F.2d at 946): The issue is whether the sums were intended to be applied to discharge payment for income items (e.g., the final month's bill for *635 gas, or for turn-on and turn-off charges or other charges for services), or on the other hand were intended to secure performance of nonincome-producing covenants (e.g., damage to meters). Of course, it is unrealistic to expect that all cases will fit neatly into one to two categories mentioned above. Often the purpose of an advance payment or deposit is mixed; it may serve both as security for property or performance of nonincome-producing covenants and also as a prepayment of bills, rent, or other charges for goods or services. As we understand it, the taxpayers here do not, nor could they, argue that the payments at issue were intended solely as collateral to secure performance of nonincome covenants; taxpayers argue only that the purpose was mixed. In such cases, the taxation of such payments must turn on the circumstances of the transaction and the intent of the parties; if the primary purpose of the payment is to act as a prepayment for goods and services, then the amount constitutes taxable income; but is the primary purpose is to secure performance of nonincome-producing covenants or to secure against damage to property, then the payment is not taxable. * * * Measured *636 against that standard, the customer deposits constituted income to petitioners. The record demonstrates that the deposits were commingled with other income receipts and were at all times subject to petitioners' unfettered use and control. The most significant item by far on most customers' final bills was the charge for gas consumed, and a deposit was typically applied as a credit against that charge.Charges for damage to meters and other nonincome items did not make up a significant portion of the total final charges. The only reasonable inference is that the deposits recevied from customers when service was begun were expected and intended in most cases to be applied eventually to the charges for gas consumed. Because that was the primary purpose of the deposits, they were, under the standard enunciated by the Eleventh Circuit, taxable income. Petitioners argue that their primary purpose in requiring customer deposits was not to collect an advance payment for goods and services, but rather to minimize collection losses and to provide a security for the accounts receivable owed by the customers. Petitioners argue further that they "have satisfied the test of the Eleventh Circuit *637 by showing that * * * [they] had no purpose, primary or otherwise, to have customer deposits act as prepayments for gas or other income items." These arguments do not, however, respond fully to the test enunciated by the Eleventh Circuit. Under that test, deposits must be categorized either as prepayments for goods and services on the one hand, or as security for the performance of nonincome-producing covenants on the other. The Eleventh Circuit, as we understand it, did not admit of the possibility of other categories. [4] *638 Therefore, the deposits herein concerned must be placed in one category or the other. It is not enough to argue, as petitioners have done, that the deposits do not fit well into the income category; it must also be shown that they fit more readily into the nonincome category. Petitioners have not forthrightly addressed themselves to the question of whether the deposits were primarily intended to "secure performance of nonincome-producing covenants (e.g., damage to meters)", nor do we think that an argument that the deposits should be so categorized could be *639 sustained on the basis of the record in these cases. The Eleventh Circuit acknowledged in one of the paragraphs quoted above that "it is unrealistic to expect that all cases will fit neatly into one of two categories." But we are required to place the deposits in these cases in one category or the other, and we have no doubt that, as between the two possibilities, they are more appropriately classified as prepayments of income than as security for nonincome-producing covenants. Petitioners argue that: [D]ecisive evidence that the primary purpose of City Gas in requiring customer deposits was not to provide an advance payment or prepayment for gas is found in the fact that customer deposits exceeded the amount of the final bill for gas and other items for about 60 percent of the customers. At the time a deposit was made, City Gas had no way of knowing when the customer would terminate service and certainly no way of knowing whether the deposit would be more or less than the final bill. * * * The fact remains, however, that the deposit was applied as a credit against charges for gas consumed on almost all of the final bills. In those cases in which the credit exceeds the charges and *640 a refund is paid to the customer, petitioners will, of course, be entitled to a deduction for the amount of the refund. Petitioners also argue that they were not permitted by Florida law to require prepayments for gas and that to have done so would have violated a Florida statute. Their interpretation of Florida law is as follows: Chapter 366.06 of the Florida Statutes (1965) Edition) provided that City Gas could make no charges which were not in accordance with tariffs approved by the Florida Public Service Commission. The approved tariffs or schedules in this case did not provide or contemplate collection of amounts in advance in payment for gas yet to be delivered. Had City Gas collected deposits for that express purpose, it would obviously have violated Florida law. Had it collected deposits ostensibly for the purpose recognized by the Commission but actually for the purpose of receiving payment for gas in advance, it would have been no less culpable. They argue from this premise that "tax rules will not be applied, or a transaction be reconstructed, in such a fashion as to be inconsistent with other statutes or to place the taxpayer in the position of violating non-tax laws." *641 In support of this contention, petitioners cite Commissioner v. First Security Bank of Utah, N.A.,405 U.S. 394 (1972). The taxpayers in that case were banks which arranged life insurance for their borrowers. The insurance was written by an independent insurance company, which then reinsured the policies with an insurance company related to the banks. The Commissioner, acting under section 482, attributed 40 percent of the reinsurance premiums received by the related insurance company to the banks, even though they were not licensed to sell insurance and could not lawfully have conducted the business of an insurance agency or received income resulting from their customers' purchase of life insurance. The Supreme Court held that the Commissioner's exercise of his authority was unwarranted; it found that attributing to the banks "income that they have not received and may not lawfully receive" was inequitable. First Security Bank of Utah, N.A.,supra at 405. The Supreme Court cited this Court's holding in L.E. Shunk Latex Products, Inc. v. Commissioner,18 T.C. 940, 961 (1952), in which this Court stated that the Commissioner had "no authority to attribute to petitioners income which *642 they could not have received." Those cases are distinguishable from the present ones. In First Security Bank of Utah, N.A., the Commissioner attributed to the taxpayers income which they did not receive and were forbidden by statute to receive. Similarly, in L.E. Shunk Latex Products, Inc., the Commissioner, again acting under section 482, attributed to a manufacturer income which it did not actually receive and was prohibited from receiving by wartime price regulations. The amounts involved in the present cases, by contrast, were actually received by petitioners, were subject to their use upon receipt, and were authorized under a Florida statute permitting utilities to require security deposits from their customers. There is no question of petitioners having violated Florida law. [5] *643 These cases are concerned merely with the Federal income tax effect of the deposits, which, it is well settled, is not governed by their character under State law. See generally Morgan v. Commissioner,309 U.S. 78, 80 (1940). Petitioners also point out that, in the case of City Gas, the treatment of the deposits as liabilities rather than as income for financial accounting purposes was required by the FPSC. They then quote the following passage from the Supreme Court's decision in Commissioner v. Idaho Power Co..418 U.S. 1, 15 (1974): [W]here a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency and that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences. [Fn. ref. omitted.] In the present cases, however, under the legal standard prescribed by the Eleventh Circuit, City Gas's method of accounting for the deposits did not clearly reflect income. The deposits, although income under that standard, were not reported as such until the final billing period. Therefore, one of the conditions stated by the Supreme Court as a prerequisite for the financial accounting method to control tax consequences is missing. 2. Year of Taxability
Because we have held that the deposits in question represented income to petitioners, we must now decide in what year that income *644 must be recognized. As detailed in our findings, petitioners reported as income each year the full amount of the retail price of the gas they delivered to their customers. The additional amounts we have at issue are the deposits which customers made when petitioners began delivering its gas and which were typically applied on the customers' final bills. Respondent argues that the year of taxability is controlled by the regulations. Section 1.451-5(b)(1), Income Tax Regs., [6] *645 states the general rule for the taxable year of inclusion of "advance payments." Under that rule advance payments must be included in income either (1) in the taxable year of receipt, or (2) except as provided with respect to "inventoriable goods," (a) in the taxable year in which properly accruable under the taxpayer's method of accounting if that method requires gross receipts to be included no later than the year in which advances are included in gross receipts for financial reporting purposes, or (b) if the taxpayer's method of financial accounting results in the advance payments being included earlier than for tax purposes, in the tax year in which included for financial accounting purposes. The exception for "inventoriable goods" is set forth in section 1.451-5(c), Income Tax Regs. Because the parties' arguments are keyed so closely to the precise language of that regulation, we quote that section *646 as follows: (c) Exception for inventoriable goods. (1)(i) If a taxpayer receives an advance payment in a taxable year with respect to an agreement for the sale of goods properly includible in his inventory, * * * and on the last day of such taxable year the taxpayer-- (a) Is accounting for advance payments pursuant to a method described in paragraph (b)(1)(ii) of this section for tax purposes, (b) Has received "substantial advance payments" (as defined in subparagraph (3) of this paragraph) with respect to such agreement, and (c) Has on hand (or available to him in such year through his normal source of supply) goods of substantially similar kind and in sufficient quantity to satisfy the agreement in such year, then all advance payments received with respect to such agreement by the last day of the second taxable year following the year in which such substantial advance payments are received, and not previously included in income in accordance with the taxpayer's accrual method of accounting, must be included in income in such second taxable year. Respondent contends, and we agree, that these cases involve advance payments for inventoriable goods and that the regulation quoted above *647 required the payments to be included in income no later than the second taxable year following the year of receipt. Under the legal standards prescribed by the court of appeals, we have concluded, for the reasons stated above, that the customer deposits were advance payments for gas to be delivered to customers. Furthermore, as we shall discuss, the advance payments were "substantial", and were made with respect to an agreement for the sale of goods "properly includable" in petitioners' inventories. Therefore section 1.451-5(c), Income Tax Regs., applies. Petitioners argue that respondent has misapplied the regulations. [7] They contend that they did not receive "substantial advance payments," as required by section 1.451-5(c)(1)(i)(b), Income Tax Regs., in order for the special rule for inventoriable goods to apply. On this ground, they argue that the special rule does not apply to their cases and that their cases are governed, instead, by the general rule of section 1.451-5(b)(1)(ii)(a), Income Tax Regs. Under that rule, they argue, the advance payments are included in income "[i]n the *648 taxable year in which properly accruable under the taxpayer's method of accounting for tax purposes." Advance payments are defined in section 1.451-5(a), Income Tax Regs., which provides, in pertinent part, as follows: Sec. 1.451-5. Advance payments for goods and long-term contracts. (a) Advance payment defined. (1) For purposes of this section, the term "advance payment" means any amount which is received in a taxable year by a taxpayer using an accrual method of accounting for purchases and sales * * * pursuant to, and to be applied against, an agreement: (i) For the sale or other disposition in a future taxable year of goods held by the taxpayer primarily for sale to customers in the ordinary course *649 of his trade or business, * * * Petitioners contend that the deposits in question fall outside the definition of "advance payment" for three reasons: (1) There was no "agreement" between petitioners and their customers for the sale of goods in a future taxable year; (2) the deposits are not made "pursuant to" an agreement; and (3) the deposits are not "applied against" an agreement. We disagree with these contentions. Petitioners' argument that there is no "agreement" for the sale of gas in a future taxable year is based upon their contention that there is, at the time of the deposit, no obligation on either side to buy or sell gas: From the standpoint of the customer, service can be discontinued at any time, including even the day service is commenced. * * * From the standpoint of the petitioners, the receipt of a deposit from the customer in no way obligates the petitioners to supply gas. * * * In fact, in the case of City Gas, its obligation to supply gas stems from the fact that it is a regulated public utility required by the FPSC to sell gas to customers within its service area. * * * Thus, there is no agreement or contractual relationship between the customer and the petitioners *650 for the sale of gas in a future taxable year as that term is used in Reg. section 1.451-5(a)(1). We believe that is would be overly technical to find no agreement to sell gas in future years simply because no formal contract was executed to buy or sell specific amounts of gas at specific times. The record demonstrates that, at the time petitioners accepted the deposits from their customers, both sides understood and, at least implicity agreed, that petitioners would supply and the customers would pay for as much gas as the customers used, and that, in the typical case, these deliveries would continue into future years. [8] *651 Certainly, as long as a gas connection was maintained, customers were obligated to pay for the gas consumed, and petitioners, for their part, had a duty to continue service absent improper use by the customer of utility property, nonpayment of bills, or something of the kind. See Memphis Light, Gas & Water Div. v. Craft,436 U.S. 1, 10 (1978). [9] We think that this is sufficient to constitute an "agreement" for the purposes of the quoted regulation. Our conclusion in this regard also disposes of petitioners' contention that the deposits were not made "pursuant to" an agreement, because *652 this is essentially a restatement of their contention the there was no agreement in the first place. Finally, petitioners argue that the deposits in question were not "applied against" an agreement. In this regard, in addition to repeating their argument that there was no agreement in the first place, petitioners argue that: "There is no relationship between either the customer's routine billing or his final bill and the customer's deposit; they are separate and distinct." The record is clear, however, that the deposit was, typically, credited against the charges for gas consumed on the customer's final bill. We think, therefore, that the deposits are "applied against" the agreement, even though the charges on the bill are computed without reference to the amount of the deposit. Accordingly, we conclude that the deposits in question were advance payments within the meaning of the applicable regulation. In order for the exception for inventoriable goods to apply, the advance payments received must be "substantial." Sec. 1.451-5(c)(3), Income Tax Regs., provides that: (3) For purposes of subparagraph (1) of this paragraph, a taxpayer will be considered to have received "substantial *653 advance payments" with respect to an agreement by the last day of a taxable year it the advance payments received with respect to such agreement during such taxable year plus the advance payments received prior to such taxable year pursuant to such agreement, equal or exceed the total costs and expenditures reasonably estimated as includible in inventory with respect to such agreement. * * * The parties disagree as to whether the deposits in question constituted "substantial advance payments." Specifically, they disagree whether the deposits equaled or exceeded "the total costs and expenditures reasonably estimated as includible in inventory with respect to such agreement." Respondent argues that this requirement is met because-- the record is clear that at all times petitioners billed their customers for gas at a rate which exceeded their cost of obtaining that gas. Therefore, the advance payments always exceed the total costs and expenditures reasonably estimated as includable in inventory with respect to such agreement. Respondent, therefore, takes the view that the deposit of, for example, $15, was made pursuant to an agreement to deliver gas having a price equal to that amount, *654 and that it is a "substantial advance payment" because the inventory value of that quantity of gas was certain to be less than $15. Petitioners take a different view of what is meant by the inventory costs which the advance payments must exceed in order for the treatment argued for by respondent to be applicable. They argue: Regulation section 1.451-5(c)(3) defines "substantial advance payments" as amounts received with respect to an agreement which: equal or exceed the total costs and expenditures reasonably estimated as includible in inventory with respect to such agreement. Under the definition then, there must first be measured the total inventoriable costs to be incurred under the agreement. This presupposes that the duration of the agreement is known. Even assuming that some agreement was found to exist between the petitioners and its [sic] customers, the duration of the agreement could not have been predicted. A customer could have terminated service in a day, a week, a month or period of years. * * * * * * If * * * it could be said that some agreement of an indefinite duration existed, the substantial advance payment test would quickly be failed. In the case of a residential *655 customer who paid a $15 deposit, the cost of gas would probably have exceeded the amount of the deposit in a month or less. In the case of a commercial customer making a deposit of approximately two months estimated gas charges, in a short time the cost necessary to fulfill any such commercial agreement significantly exceede [sic] the deposit received. There would therefore be no substantial advance payments and the exception of Reg. section 1.451-5(c)(1) would not apply to the petitioners. Petitioners, in other words, take the view that the nature of the agreement, if one existed at all, was to deliver an unspecified amount of gas for an unspecified length of time, and that the inventory costs which the advance payments must exceed in order for the exception to apply are the costs of all of the gas sold over the term of the agreement, not just $15 worth. Because the costs of all of the gas eventually delivered will, in the usual case, far exceed the amount of the deposit, petitioners argue that the deposits are not "substantial advance payments." It follows, petitioners contend, that their case is controlled, not by the exception for inventoriable goods, but by the general rule *656 of section 1.451-5(b)(1)(ii)(a), Income Tax Regs., under which the deposits are included in income in the same taxable year in which they are properly accruable under petitioners' tax accounting method. We think that respondent's view of the transaction is the better one. We consider it unrealistic of petitioners to interpret the "inventory" referred to in the regulation as the total amount of gas delivered over the entire course of their service to the customer, and to argue that the amount of the deposit must be substantial in relation to that large and indefinite quantity of gas. Most of the gas was paid for month-by-month, with payments unrelated to the deposit. The deposit was, in effect, a prepayment for the gas against which it was credited on the customer's final bill. Because, as respondent points out, the cost of that gas to petitioners was invariably less than the rate at which it was billed to their customers, the deposit was a "substantial advance payment" as defined in the regulation. Petitioners also argue that the regulations' treatment of advance payments for inventoriable goods does not apply to City Gas because it had no inventory. As set forth in our Findings *657 of Fact, City Gas had no storage facility. All of the gas it received from its supplier was delivered immediately to its customers and reported as sold for tax purposes, even when the customers had not yet been billed for all the gas delivered. There is no question, however, that the gas purchased by City Gas would have been "properly includable" in inventory had such an account been maintained. [10] *658 The gas was, therefore, "properly includable" in inventory even though the speed with which it was turned over made the maintenance of an inventory account unnecessary. 3. Tax Treatment of Customer Deposits Received in Years Before 1966
We must also decide whether the taxation of the deposits received by petitioner in years prior to 1966 is barred by the statute of limitations. Sec. 6501(a) provides generally that taxes shall be assessed within 3 years after the return was filed. Under the general 3-year period of limitations, respondent's adjustments for years prior to 1966 would be barred. Under section 481, however, a different rule is provided: (a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")-- (1) If such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is *659 attributable to a change in the method of accounting initiated by the taxpayer. [11]
The purpose of section 481 is "to prevent income from escaping tax altogether and to prevent double taxation of income where such escape or doubling up resulted solely from a change in method of computing taxable income." Pursell v. Commissioner,38 T.C. 263, 271 (1962), affd. per curiam 315 F.2d 629 (3d Cir. 1963). When applicable, section 481 overrides the provisions of section 6501 and permits the Commissioner to adjust a taxpayer's income for the "year of the change" for income earned in otherwise closed years but unreported in those years under the old method *660 of accounting. W.S. Badcock Corp. v. Commissioner,59 T.C. 272, 288-289 (1972), revd. on other isues 481 F.2d 1226 (5th Cir. 1974); Graff Chevrolet Co. v. Campbell,343 F.2d 568 (5th Cir. 1965). Respondent contends that adjustments pursuant to section 481 are necessary in this case because, under the new method of accounting, the income recognized in a customer's final billing period will be reduced by the amount of the deposit applied on the final bill. If the deposit was not previously taken into income as an advance payment for the gas against which the deposit is eventually applied, then the income from the sale of that quantity of gas will escape taxation altogether. Respondent argues, therefore, that he must be allowed to make adjustments under section 481 to the "year to the change," fiscal 1966, charging petitioners with income from deposits made in otherwise closed years extending back to the effective date of the 1954 Code.
Section 481 comes into play only when there has been a change in the taxpayer's "method of accounting." The statute itself does not define what constitutes a change in the taxpayer's "method of accounting." Some guidance as to the meaning to the phrase *661 is found, however, in sec. 1.481-1(a)(1), Income Tax Regs., which provides as follows: A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. For rules relating to changes in methods of acounting, see section 446(e) and paragraph (e) of section 1.446-1. Sec. 1.446-1(e), Income Tax Regs., provides in turn, as follows: (ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. * * * A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. * * * (b) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve *662 the proper time for the inclusion of the item of income of the taking of a deduction. * * * Petitioners contend that, even if respondent's assertion that the customer deposits were income is correct, they have, nevertheless, not changed their method of accounting for the deposits, but have merely corrected an erroneous application of their old accounting method. Petitioner's contention is based on their assertion that respondent's determination effects neither a "change in the overall plan of accounting" nor "a change in the treatment of any material item used in such overall plan." We agree with petitioners that their overall plan of accounting has not been changed; they were and continue to be accrual basis taxpayers. We are, however, unable to agree that there has been no change in the treatment of any material item in the overall plan. Petitioners argue that the change effected by respondent in their method of accounting for the deposits is not a change in a meterial item because it does not involve "the proper time for the inclusion of the item in income or the taking of a deduction. " The deposits, they contend, were never included in income under their old accounting treatment. *663 Therefore, their argument runs, this case does not involve a question of when a particular item will be included in income, but rather one of whether the item constitutes income at all. As we view these cases, however, they involve precisely a question of timing. As discussed in connection with issue 1, above, application of the legal standards mandated by the court of appeals compels the conclusion that the customer deposits were advance payments for gas to be delivered in the customer's final billing period and were thus income. Respondent concedes that petitioners must be allowed a deduction for deposits previously included in income which are subsequently returned to the customers. Therefore, the overall income from sales of gas recognized by petitioners will be the same under the method urged by respondent as it would have been under petitioners' old method. The difference between the two methods is merely that the income is recognized earlier under respondent's method than under petitioners'. Under respondent's method, it will be recognized not later than the second taxable year after the customer deposits were received as provided by section 1.451-5(c), Income Tax Regs. *664 Under petitioners' method, it would not be recognized until the taxable year of the final billing period. We hold, therefore, that the change in accounting for the deposits effected by respondent was a change in a "material item" in petitioners' overall plan of accounting. As such, it was a change in petitioners' "method of accounting" for purposes of section 481. See Schuster's Express, Inc. v. Commissioner,66 T.C. 588, 597 (1976), affd. per order 562 F.2d 39 (2d Cir. 1977); Primo Pants Co. v. Commissioner,78 T.C. 705, 720-725 (1982). Respondent may, therefore, in the words of section 481(a), make adjustments for the "year of the change" in order to "prevent amounts from being * * * omitted." To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: Dri-Gas Corporation, dkt. No. 8807-73, and Dade Gas Company, dkt. No. 8809-73.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. City Gas was required to use this treatment for financial reporting purposes because it was required by the National Association of Regulatory Utility Commissioners (NARUC) Uniform System of Accounts, which the FPSC prescribed for the utilities under its jurisdiction.↩
1. This amount represents the difference between the balances in the customer deposits accounts on Mar. 31, 1966, and on Mar. 31, 1955. ↩
2. These amounts represent the balances in the customer deposit accounts on Mar. 31, 1966.↩
4. Petitioners attempt to distinguish between deposits which "pay" income items and deposits which merely "secure" the later payment of such items. We do not think this distinction is recognizable under the test enunciated by the Eleventh Circuit. In City Gas Co. of Florida v. Commissioner,689 F.2d 943, 948, n. 7 (11th Cir. 1982), revg. and remanding 74 T.C. 386 (1980), the court said: If on remand the Tax Court concludes that the primary intent was that the sums at issue be applied to discharge income items on the final bill (e.g., charges for gas, turn-on and turn-off and other service charges), the fact that the sums were labeled as "deposits to secure payment" cannot by itself preclude a finding that the sums were intended as prepayments. Although several courts have mentioned the "security" label as one factor, * * * we have found no case which would support a finding for the taxpayer where sums labeled as a "deposit" or "security" were subject to the unrestricted control of a taxpayer with a present right thereto and were intended to be applied against income items. The case law requiring a finding for the Commissioner under such circumstances * * * is based, we think, upon the unarticulated rationale that under such circumstances the sums are in substance prepayments. * * *
5. We do not accept petitioners' argument, quoted in text above, that the collection of deposits specifically authorized by Florida statutes would be illegal if carried out for the subjective purpose of receiving prepayment for gas.
6. Sec. 1.451-5. Advance payments for goods and long-term contracts. (b) Taxable year of inclusion. (1) Advance payments must be included in income either-- (i) In the taxable year of receipt; or (ii) Except as provided in paragraph (c) of this section, (a) In the taxable year in which properly accruable under the taxpayer's method of accounting for tax purposes if such method results in including advance payments in gross receipts no later than the time such advance payments are included in gross receipts for purposes of all of his reports (including consolidated financial statements) to shareholders, partners, beneficiaries, other proprietors, and for credit purposes, or (b↩) If the taxpayer's method of accounting for purposes of such reports results in advance payments (or any portion of such payment) being included in gross receipts earlier than for tax purposes, in the taxable year in which includible in gross receipts pursuant to his method of accounting for purposes of such reports.
7. Sec. 1.451-5, Income Tax Regs., was promulgated in 1971, subsequent to the years herein concerned. Sec. 7805(b) authorizes the Secretary of the Treasury to prescribe the extent, if any, to which regulations shall be applied without retroactive effect. The retroactivity of sec. 1.451-5, Income Tax Regs.↩, was not limited by the Secretary, and petitioners' objection to respondent's application of the regulation is based on substantive grounds rather than on the grounds or retroactivity.
8. In those cases in which service was terminated in the same year in which it was commenced, the problem with which we are herein concerned would not arise. As much of the deposit as was credited against charges for gas would, of course, be income to petitioners in that year. 9. Florida's public utilities are required to furnish service to each person applying therefor, upon terms as required by the Florida Public Service Commission. No public utility may give any person unreasonable preference or subject him to unreasonable prejudice. Fla. Stat. Ann. sec. 336.03. As the Supreme Court of Florida has stated: It is the general rule in this state as well as most, if not all, of the others, that a corporation which occupies streets and highways, with its mains, pipes, or wires, and is engaged in the business of furnishing gas or electricity for light, heat, fuel, or power, is under a legal duty to supply the same to any person who applies therefor and complies with its reasonable regulations, and, if it wrongfully refuses to do so, mandamus will lie. [Citations omitted] Florida Power and Light Co. v. State ex. rel. Malcom et al,107 Fla. 317, 144 So. 657↩ (1932).
10. See sec. 1.471-1, Income Tax Regs., making the use of inventories mandatory for all businesses in which "the production, purchase, or sale of merchandise is an income-producing factor." The Board of Tax Appeals held long ago that goods in transit, sold by a taxpayer and delivered to customers without having come into the physical possession of the taxpayer must be included in inventory. Fishel v. Commissioner,14 B.T.A. 87, 88 (1928); see also Rev. Rul. 68-620, 1968-2 C.B. 199 ("line pack" gas of a natural gas transmission company); Rev. Rul. 78-352, 1978-2 C.B. 168 (natural gas in the pipeline distribution system of a public utility that has obtained title to the gas).
11. The taxable years "to which this section does not apply" referred to in sec. 481(a)(2) are those years not covered by the Internal Revenue Code of 1954. No adjustments may be made with respect to those pre-1954 Code years which are not "attributable to a change in the method of accounting initiated by the taxpayer." See Perelman v. Commissioner,41 T.C. 234, 240↩ (1963). Respondent concedes that he, rather than the taxpayers, initiated the changes here involved. Accordingly, he has made no adjustments for years not covered by the 1954 Code.